Benny Ray HATLEY *v.* STATE of Arkansas

CR 85-192                                           709 S.W.2d 812

Supreme Court of Arkansas
Opinion delivered May 27, 1986

*Joe N. Peacock*, and *Robert F. Meurer*, for appellant.

*Steve Clark*, Att'y Gen., by: *Clint Miller*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. On July 13, 1984 the Chief of Police and a patrolman for the City of Cotton Plant, Arkansas, were shot and killed while investigating the theft of a motorcycle. At 4:00 a.m. on the 14th appellant Benny Hatley was arrested in Des Arc for those murders. He was taken to the Des Arc police station where he later gave a statement admitting shooting the two officers. Hatley was convicted and sentenced to life imprisonment without parole on each charge of capital felony murder. On appeal, Hatley raises eight points of error, the primary contention being that his confession should have been suppressed because he was questioned after he had invoked his right to remain silent, in violation of the Miranda rule. We affirm.

Officer Stice, who arrested Hatley, had no experience in interrogation. When he brought Hatley in he had no intention of interrogating him, and had orders to wait until others arrived before any interrogation began. Stice read Hatley the Miranda warnings as a precaution, and when he asked Hatley to sign the Miranda form Hatley told Stice he didn't want to say anything. Hatley was immediately taken to a cell.

Two hours later Hatley was brought downstairs for trace metal tests. By then Officer Gage of the State Police had arrived. He had not been told what Hatley had said, but was told he might not talk. Gage said, "I'm Bill Gage with the State Police. Benny, you're in a lot of trouble. You want to tell me about it?" and Hatley replied, "Yes, sir, I'll talk to you." Hatley does not dispute Gage's statement. At that point, Gage read the Miranda warnings again and went over each right individually. Hatley then told his story, readily admitting shooting the two officers.

Whether renewed questioning after a suspect has invoked his Miranda right to remain silent will constitute a violation of the Miranda principles has not previously been dealt with by this court, but was first addressed by the United States Supreme Court in *Michigan* v. *Mosley*, 423 U.S. 98 (1975). The opinion points out the court was considering only the procedures involved in a request to remain silent, noting a difference between a request for counsel and a request to remain silent, distinguished in Miranda by the procedural safeguards triggered by each.

*Mosley* at 101, n. 7, 102, n. 10. Police interrogation is more severely restricted after the suspect asserts his right to counsel than after he asserts his right to silence. *Edwards* v. *Arizona*, 451 U.S. 477 (1981). See also *Anderson* v. *Smith*, 751 F.2d 96 (2nd Cir. 1984). In *Mosley* (as in this case) no attorney was requested so the issue was limited to what restrictions are placed on the police after a request to remain silent had been made.

In *Mosley*, the defendant was arrested for several robberies, and told his Miranda rights at the station. He refused to say anything and no further efforts were made to question him. Two hours later another officer questioned him about an unrelated murder. Mosley was again told his rights under Miranda and he then gave an incriminating statement. The Supreme Court rejected a literal reading of Miranda that would require "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances." Identifying the critical passage in Miranda, the Supreme Court concluded that admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was "scrupulously honored." On that basis, the *Mosley* court found no violation of *Miranda*. The police immediately stopped the interrogation, resumed questioning after the passage of a significant period of time, provided defendant with a new set of Miranda warnings and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation. The Court pointed out that, "[t]his was not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance or make him change his mind."

The Eighth Circuit has had occasion to review the question presented here and in *Mosley*, where the renewed interrogation involved the same crime. That Court has found that questioning about the same crime is not necessarily crucial but rather whether the defendant's right to cut off questioning was scrupulously honored. In *United States* v. *Finch*, 557 F.2d 1235 (8th Cir. 1977), the Eighth Circuit found no violation where the police immediately stopped questioning the defendant on his request and twenty hours later approached him again. New warnings

were given and the defendant made a statement. The court found no efforts by the police to wear down the defendant's resistance and concluded the defendant's right to cut off questioning was scrupulously honored. See *Jackson* v. *Wyrick*, 730 F.2d 1177 (8th Cir. 1984) (no evidence that officers attempted to induce the defendant not to invoke his right to remain silent); *United States* v. *Udey*, 748 F.2d 1231 (8th Cir. 1984); *Stumes* v. *Solem*, 752 F.2d 317 (8th Cir. 1985). These courts have interpreted *Mosley* rather broadly.

In contrast, other jurisdictions have taken a more limited approach to *Mosley*, either with a greater restriction of the case to its facts or by more caution in the application of the "scrupulously honored" test. In *United States* v. *Olof*, 527 F.2d 752 (9th Cir. 1975) the Ninth Circuit found a defendant's rights were violated when questioning was resumed about the same crime three hours after he had refused to make a statement. The defendant was interrogated a second time while in handcuffs, one of the two agents present knowing of the defendant's prior refusal. He was again advised of his Miranda rights and though the second attempt to interrogate was of short duration the court found the defendant's rights violated. The defendant was urged to cooperate and told his cooperation would be called to the attention of the United States Attorney.[1] The agent then confronted the defendant with a description of federal prison, that it was a "dark place" where they "pumped air" to the prisoners. Relying on *Mosley*, the court found the defendant's right to cut off questioning was not scrupulously honored where the two interrogations were based on the same crime and the object of the second interrogation was to wear down the defendant's resistance. See also *Commonwealth* v. *Walker*, 470 Pa. 534, 368 A.2d 1284 (1977); *Anderson, supra*; *State* v. *Greene*, 92 N.M. 347, 588 P.2d 548 (1978); and see LaFave, Criminal Procedure § 6.9 (1984); see also *People* v. *Mattson*, 37 Cal.3d 85, 207 Cal.Rptr. 278, 688 P.2d 887 (1984).

Apart from how broadly or narrowly *Mosley* is applied, emphasis on interrogation about a *different* crime is, we believe, misplaced. The majority in *Mosley* provides only limited and

---

[1] The court noted this was permissible under other circumstances, but would be reviewed in the context of renewed questioning.

dubious explanation as to why the renewed questioning on a different crime gave any greater justification for its lowering of the Miranda requirements than if the same crime were involved. See the dissent in *Michigan* v. *Mosley, supra,* which we find persuasive, for further elaboration on this point.

Given that, we think the importance in *Mosley,* as the Court itself recognized, drawing on Miranda, is on strict adherence to its dictates of scrupulously honoring the defendant's right to remain silent.

■■ To "scrupulously honor" the defendant's "right to cut off questioning" means simply that once the defendant has invoked his right to remain silent, his will to exercise that right will remain undisturbed; there must be no attempt to undermine his will and he must be secure in the knowledge he is under no compulsion to respond to any questions. Such a determination will, of course, depend on the facts in each case relative to the conduct of the police and of the defendant.

■ We believe Hatley's right to cut off questioning consistent with the *Mosley* standard was not transgressed. There is nothing to suggest there were efforts to wear down his resistance or to prevail on him to change his mind. When Hatley was brought to the station there was not even an attempt to question him after the Miranda warnings were given, and Gage's comment to him two hours later in the radio room was the first and only time Hatley was asked whether he had anything to say regarding the charges. Having been fully informed that he had a right to remain silent, Hatley readily responded that he did wish to talk and the single fact that he had volunteered the earlier comment when the Miranda warnings were given cannot and should not void a statement clearly shown to have been made willingly.

We note, too, that Hatley's detention prior to Gage's question was about two hours, of sufficient length to produce more than a momentary lull before being approached again, thus avoiding the effects of repeated questioning. See *Anderson, supra,* and *Mosley, supra.* Yet the interval was not so long as to produce an inference that his cooperation was the result of lengthy "incommunicado detention." *United States* v. *Pheaster,* 544 F.2d 353 (9th Cir. 1976). Nor do we think Gage's comment objectionable. It was direct and reasonable stating only the

obvious, but lacking the quality of coercion and threat found in *Olof, supra.*

After Gage's comment and Hatley's affirmative response, there was no further questioning by Gage until the Miranda rights were again explained. When Hatley responded to Gage's question, it was an immediate and unequivocal "yes," and when he told his story it was in narrative fashion and not in response to a series of questions by the interrogator. See *Wilson v. Henderson,* 584 F.2d 1185 (2nd Cir. 1985). The total time that Gage talked to Hatley, including the taking of the statement, was about fifteen minutes.

■■ Hatley's next point is that his right to remain silent was not voluntarily and intelligently waived. Factors to be considered in determining the voluntariness of the waiver include age, education and intelligence of the accused, advice or lack of advice of constitutional rights, length of detention, repeated or prolonged questioning and the use of mental or physical punishment. *Douglas v. State,* 286 Ark. 296, 692 S.W.2d 217 (1985). Hatley was sixteen years old and had at least a sixth grade education. He could read, although the psychologist who evaluated him found him mildly retarded with limited reading ability and thought these factors would prevent him from understanding his rights. However, Hatley testified at the suppression hearing and indicated he was well acquainted with his rights and understood them. He said the rights had been explained to him at least ten times and maybe more in the last five years, that he'd "heard them over and over again" and understood them on the occasion of this arrest. A low intelligence quotient will not in itself render a waiver involuntary, see *Hignite v. State,* 265 Ark. 866, 581 S.W.2d 552 (1979), where the evidence shows the waiver was knowing and voluntary. Additionally, as noted earlier, Hatley's rights were gone over carefully by the interrogating officer and thoroughly explained. Nor is there any indication here of a long detention or repeated and extended questioning, and appellant himself testified at the suppression hearing that he was not threatened, coerced nor coaxed by anyone but that he was treated "like a gentleman." The evidence clearly supports a finding that the waiver was voluntarily and intelligently given.

■ Hatley next maintains that photographs of the victims should have been excluded as their probative value was out-

weighed by the danger of unfair prejudice. No objection was raised below and we will not consider arguments not presented to the trial court. *Smith* v. *State*, 286 Ark. 247, 691 S.W.2d 154 (1985).

Hatley also argues that information concerning parole was improperly brought to the attention of the jury during deliberation. The jury foreman had brought with him into the jury room a short newspaper article listing recent parolees from the Arkansas Department of Correction, listing the names of inmates, their crimes and the beginning dates of their sentences.

■ The argument is without merit. We have previously considered this question and held that a reference to the possibility of parole by a juror would not constitute reversible error. *Veasy* v. *State*, 276 Ark. 457, 637 S.W.2d 545 (1982). In that case, one of the jurors approached the defense attorney in the courthouse a few days after the trial and said that the jury had assumed the defendant would serve considerably less than thirty-five years in prison because of the parole system. Citing *Ashby* v. *State*, 271 Ark. 239, 607 S.W.2d 675 (1980) we said:

> . . . If the jury or any of them did take the possibility of parole into consideration in their determination of appellant's sentence, any information they had concerning parole was independent knowledge which they had prior to trial.
>
> * * *
>
> . . . It would be highly unrealistic for this court to think that jurors do not consider the possibility of parole in arriving at a sentence in a criminal case. The outward expression of that by a juror is not grounds for a new trial.

Here, the juror stated the article contained no information that was not already a part of his common knowledge and the article was not circulated. There is no indication the information was used to improperly influence any juror.

■ A final point concerns four objections to the death qualified jury, all which have been rejected by this court. See *Rector* v. *State*, 280 Ark. 385, 659 S.W.2d 168 (1983). On the day this case was submitted the question of the constitutionality

of death-qualified juries was conclusively settled by the United States Supreme Court in the case of *Lockhart* v. *McCree*, ___ U.S. ___ (Slip Op. 84-1865, decided May 5, 1986). The arguments that death-qualified juries are unconstitutional were rejected.

Under our Rule 11(f), we consider all objections brought to our attention in the abstracts and briefs in appeals from a sentence of life imprisonment or death. In this case we find no prejudicial error in the points argued or in the other objections abstracted for review.

The judgment is affirmed.

PURTLE, J., not participating.